# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1262V

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                             *
THOMAS GRANT,                                *        Chief Special Master Corcoran
                                             *
            Petitioner,                      *        Filed: August 31, 2023
                                             *
v.                                           *
                                             *
SECRETARY OF HEALTH                          *
AND HUMAN SERVICES,                          *
                                             *
            Respondent.                      *
                                             *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*David J. Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Zoe Wade*, U.S. Dep't of Justice, Washington, DC, Respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES[1]

On September 24, 2020, Thomas Grant filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine he received on October 3, 2018. Petition (ECF No. 1) ("Pet.") at 1. The matter was originally assigned to the "Special Processing Unit" (the "SPU"), because it appeared to assert a Table claim that would likely prove easily resolved.

However, the parties were unable to settle damages after I granted entitlement to Petitioner on June 1, 2021. *See* Ruling, dated June 1, 2021 (ECF No. 23). Eventually, it was determined that

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa–10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. §§ 300aa.

the matter was no longer appropriately maintained in SPU, as the nature of the parties' disputes began to expand, and therefore it was transferred to my individual docket in early 2013. By that time, the parties had already briefed their respective positions, and represented their willingness to have the dispute resolved without a hearing. *See* Petitioner's Brief, dated Mar. 10, 2022 (ECF No. 38) ("Mot."); Respondent's Opposition, dated May 12, 2022 (ECF No. 41) ("Opp."). Petitioner's Reply, dated Nov. 22, 2022 (ECF No. 44) ("Reply"); *see also* Status Report, dated February 7, 2023 (ECF No. 47).

For the reasons set forth below, I find that Petitioner is entitled to the following damages components: **$180,000.00** for pain and suffering, and **$9,475.75** for lost prior wages. Future lost wages and life care plan amounts will be determined later, after the parties recalibrate their calculations in light of the fact findings contained in this Ruling.

## I.     **Factual Background**

Petitioner was born on October 5, 1942, and received the flu vaccine on October 3, 2018, in San Antonio, Texas (when he was almost 76 years old). Ex. 2 at 1. A little more than two weeks later, on October 18, 2018, he was admitted to San Antonio Military Medical Center, where he saw neurologists, Kelsey Cacic, M.D. and Thomas Duginski, M.D., for a consultation. Ex. 3 at 692. Petitioner reported

> [two to three] episodes of transient vision loss, lasting [five to seven] minutes in his left eye[], described as though [a] 'horizontal line' was drawn through his vision and [he could not] see the upper portion; this occurred most recent two days ago, then three months prior, and possibly one other time in [six] months. Two days ago, he also noted tingling in the palm of his left hand which has persisted, not extending past the wrist, accompanied by decreased grip strength in his dominant hand, although [he] denies dropping items. On [the] morning of presentation, [he] . . . woke up around 0645 and immediately [noticed] weakness in his legs . . . which he initially attributed to fatigue as he had slept poorly. He was able to stand but needed assistance to walk, using walls or his wife for support throughout the day.

*Id.*

Upon examination, Petitioner exhibited a wide-based shuffling gait, left hand paresthesia on baseline neuropathy, absent deep tendon reflexes, decreased proprioception, and light touch distally. Ex. 3 at 692–94. Dr. Duginski assessed Petitioner with "proximal arm weakness, proximal bilateral leg weakness, areflexia, and stocking distribution hypesthesia in the lower extremities." *Id.* It was further noted that Petitioner was "unable to stand without assistance. DDX [differential diagnoses] for the paraparesis [include] a cord lesion vs. acute demyelinating polyneuropathy superimposed upon the chronic polyneuropathy[,] [and] it is unclear if the areflexia is new or old." *Id.* at 709.

2

Later that day, Petitioner underwent multiple imaging studies, including an MRI of his spine, which showed "C3/4 and C5/6 stenosis without cord signal changes and [his] acute progression of symptoms may indicate GBS." Ex. 3 at 716–17. Two days later, on October 20, 2018, Petitioner received a dose of IVIG, and a lumbar puncture was performed—the results of which showed elevated protein and glucose in Petitioner's CSF, with no elevation in the white blood cell count—thus supporting a GBS diagnosis. *Id.* at 751–52.

On October 23, 2018, Petitioner underwent an EMG. The clinical impression derived from it was acute weakness, and "[w]hile overall history and physical exam is consistent with an acute inflammatory demyelinating polyneuropathy, no firm electrodiagnostic evidence of demyelinating or conduction block was noted in today's study." Ex. 3 at 122.

Petitioner was discharged from the hospital on October 26, 2018, and transferred to Post Acute Medical Specialty of San Antonio. *Id.* at 824–25. He was then admitted for physical therapy ("PT"), occupational therapy ("OT"), rehabilitation, and continued medical management. Ex. 4 at 45–46. Petitioner saw internist, Mehmood Khan, M.D., who assessed Petitioner with "[s]evere debilitation weakness, impaired mobility, most likely secondary to [GBS], [with] acute onset." *Id.*

On October 31, 2018, Petitioner followed up with Dr. Khan. Ex. 4 at 85. Dr. Khan noted that Petitioner had "severe generalized weakness, impaired mobility and impaired ADLs most likely due to [GBS] post influenza injection" and recommended that Petitioner continue aggressive PT and OT as tolerated. *Id.* The next day, on November 1, 2018, Petitioner was transferred to inpatient rehabilitation at Warm Springs for continued PT/OT. *Id.* at 36.

Petitioner was then later transferred by ambulance and readmitted to San Antonio Military Medical Center on November 12, 2018. Ex. 5 at 36, 121. Dr. Cacic evaluated Petitioner, and documented that Petitioner's "symptoms of worsening paresthesias, decreased dexterity, and most importantly declining respiratory function [were] concerning for continued progression of his known GBS." Ex. 3 at 270–72. It was recommended that Petitioner repeat IVIG treatment for three days. *Id.* at 274. On November 16, 2018, Petitioner was discharged from San Antonio Military Medical Center and returned to Warm Springs following a PT evaluation of his continued care requirements. *Id.* at 351–52.

After a fairly lengthy hospital stay, Petitioner was discharged from inpatient rehabilitation at Warm Springs on March 25, 2019, but continued to received outpatient OT with Apex Home Health from March 26, 2019, to May 29, 2019, working on strength, gait and transfer training, and balance strengthening. Ex. 7 at 89.

Petitioner began therapy with Texas Physical Therapy Specialists on April 15, 2019. Ex. 8 at 10. He participated in twenty PT sessions for "generalized [lower extremity] strength impairments, general deconditioning and reduced activity tolerance, and significantly impaired function." *Id.* at 10, 137. At discharge, on June 3, 2019, Petitioner's strength and endurance were noted as having improved, but he could no longer benefit from further PT. *Id.*

On July 12, 2019, Petitioner saw Dr. Cacic for a neurology follow-up. Ex. 3 at 125–29. Dr. Cacic noted that Petitioner had made significant improvements in PT. Ex. 3 at 125. It was then noted that he had been using a rolling walker after being discharged from inpatient rehab in March but had "…now advanced to a cane as needed." *Id.* Dr. Cacic observed that Petitioner "has regained enough strength/function to go back to work part-time and denies any significant daily impairment due to AIDP sequelae." *Id.* at 129.

Six months later, Petitioner met with Dr. Cacic for another neurology follow-up on January 14, 2020. Ex. 3 at 119. Petitioner reported that he was "[p]rogressing along well…" but still desired more PT. *Id.* Dr. Cacic noted that Petitioner also continued to experience minor fatigue but could forgo a nap when needed. *Id* at 120. It was also noted that Petitioner still was experiencing mild tingling in his fingertips. *Id.*

On February 12, 2020, Petitioner reported to an oncologist, Edsel Hesita M.D., at Texas Oncology. Petitioner was at this time diagnosed with chronic lymphocytic leukemia ("CLL")/small lymphocytic lymphoma.[3] Ex. 12 at 35. Petitioner's wife—who accompanied petitioner to the visit—reported that Petitioner was "…always tired." *Id.* It was also noted that Petitioner had fatigue beginning several months ago, although as early as April 11, 2018 (pre-vaccination) it had been noted that Petitioner had also been experiencing fatigue. *See* Ex. 9.[4] On August 18, 2020, Petitioner had a telehealth follow-up appointment with Dr. Hesita, who noted that Petitioner's lymphocyte count was "slightly elevated indicating a response to treatment." *Id.* at 5. As a result, Petitioner was advised to continue ibrutinib[5] until further progression. *Id.*

There is a subsequent gap in records establishing treatment. However, on May 5, 2021 (during the pendency of this case), Petitioner saw Linda Esquival, M.D. Ex. 14 at 1. Following an assessment, Dr. Esquival noted that Petitioner had exhibited no further improvement, and that he was experiencing ongoing and likely permanent symptoms of GBS. Specifically, Dr. Esquival wrote:

> Mr. Grant has completed physical and occupational therapy, which helped. Further, therapy did not seem to render any further improvement. Given his stability and lack of further improvement, therapy was stopped per physical therapist recommendations. The symptoms that persist, including extremity

---

[3] "Chronic Lymphocytic Leukemia" is defined as "a common form mainly seen in the elderly; symptoms include lymphadenopathy, fatigue, renal involvement, and pulmonary leukemic infiltrates. Circulating malignant cells are usually differentiated B lymphocytes; a minority of cases have mixed T and B lymphocytes or entirely T lymphocytes." *Chronic Lymphocytic Leukemia*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=85253&searchterm=chronic+lymphocytic+leukemia (last visited Aug. 31, 2023).

[4] In fact, on July 24, 2019, Petitioner's fatigue was deemed long-standing. Ex. 9 at 45.

[5] "Ibrutinib" is defined as "an antineoplastic targeted therapy inhibitor of Bruton's tyrosine kinase." *Ibrutinib*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=137189&searchterm=ibrutinib (last visited Aug. 31, 2023).

weakness, gait instability, imbalance and fatigue, appear to be permanent
symptoms of GBS. I continue to recommend the use of his cane or walkers
as instability worsens as well and possible modifications to home.

Ex. 14 at 1. Dr. Esquival opined overall that Petitioner's quality of life was greatly affected by his
GBS diagnosis. *Id.*

## II.   Relevant Law on Damages Determinations

### A.  *General Considerations*

A petitioner may recover "actual unreimbursable expenses incurred before the date of
judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the
petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such
injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined
to be reasonably necessary." Section 15(a)(1)(A)(i) –(iii). The petitioner bears the burden of proof
with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*,
No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

As noted above, this provision of the Act permits recovery of costs *to be incurred* for future
care as well, although such costs must be shown to be "reasonably necessary." Section
15(a)(1)(A)(iii)(I) –(II). The meaning of the phrase "reasonably necessary" is somewhat imprecise,
as I have recognized in other cases. *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-707V, 2016
WL 3577540 (Fed. CL. Spec. Mstr. May 12, 2016) (citing *I.D. v. Sec'y of Health & Human Servs.*,
No. 04-1593V, 2013 WL 2448135, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) (defining
"reasonably necessary" to mean "that which is required to meet the basic needs of the injured
person . . . but short of that which may be required to optimize the injured person's quality of
life"); *see also Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285 (Cl. Ct.
Spec. Mstr. Sept. 18, 1992) (defining the term to mean more than merely barely adequate, but less
than the most optimal imaginable). And it goes almost without saying that such costs must *also*
pertain to care associated with the alleged injury or its sequalae.

### B.  *Pain and Suffering*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and
projected pain and suffering and emotional distress from the vaccine-related injury, an award not
to exceed $250,000.00." Section 15(a)(4). There is no mathematic formula for assigning a
monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125,
at *9 ("[a]wards for emotional distress are inherently subjective"); *Stansfield v. Sec'y of Health &
Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996).

Factors to be considered when determining an award for pain and suffering include: 1)
awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL
2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL
777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70

F.3d 1240 (Fed. Cir. 1995)). I may consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009). And, of course, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 589–90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593–95. Under this alternative approach, the statutory cap merely cuts off higher pain and suffering awards—it does not shrink the magnitude of all possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations, and underscores the importance of evaluating pain and suffering *first and foremost* on the basis of the injured party's own experience.

Program decisions have generally recognized that GBS is a particularly frightening injury, given its nature and progression. *Enstrom v. Sec'y of Health & Hum. Servs.*, No. 20-2020V, 2023 WL 345657, at *6 (Fed. Cl. Spec. Mstr. Jan. 20, 2023) (awarding $170,000.00 in pain and suffering) (citing *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. MStr. Mar. 11, 2021)). As a result, it is common to award actual pain and suffering amounts in such cases in excess of $100,000.00—and typically even more.[6] *Enstrom*, 2023 WL 345657, at *6 n.14 (observing that in the majority of prior decisions involving GBS, actual pain and suffering awards made in reasoned decisions were usually not less than $125,000.00).

## C.  *Lost Wages – Past and Future*

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where

---

[6] Statistical data for all GBS cases resolved in SPU by proffered amounts from SPU's inception through July 1, 2023, reveals $167,600.00 as the median sum awarded for *all* damages in such cases. The awards in these cases—totaling 307, have typically ranged from $127,346.66 to $254,153.78, representing cases between the first and third quartiles and awards comprised of all categories of compensation—including lost wages. 39 cases include the creation of an annuity to provide for future expenses.

Past pain and suffering amounts awarded in substantive decisions issued in 28 SPU GBS cases range from $125,000.00 to $192,500.00 with an additional case involving annuity payments. The median amount award in these 29 cases was $171,248.72. Awards in cases falling with the first and third quartiles range from $158,027.98 to $180,000.00.

the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner 'in accordance with generally recognized principles and projections.'" *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (citing Section 15(a)(3)(A)). Moreover, the Vaccine Act requires that any award of compensation relating to future damages shall be reduced to its net present value. Section 15(f)(4)(A).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and thus refusing to allow lost wages on a planned business venture that was too indefinite); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020 (citing *J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with *some* evidence, if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g.*, *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope).

## II.   Appropriate Compensation in this Matter

### A.  Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his GBS. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole including the medical records and affidavits filed, and all assertions made by the parties in written documents. Petitioner's medical records and affidavits provide descriptions of his treatment course and the pain and suffering he experienced during his illness. Petitioner had an eight-day hospitalization, approximately five-month stay in inpatient rehabilitation, two rounds of IVIG treatment, and a significant amount of physical therapy and occupational therapy. Petitioner continues to require substantial assistance with his activities of daily living and uses an assistive device (roller walker) to walk. Although Petitioner continues to experience some ongoing sequelae, including fatigue and muscle weakness, his recovery has been relatively good.

Overall, Petitioner's specific treatment course was lengthier and more severe than what many other injured claimants have experienced—but also not comparable to the worst GBS cases, which can feature permanent disabilities even after primary treatment concludes. Although as a

class, GBS injuries warrant somewhat higher pain and suffering awards, not all GBS courses are the same.

Based upon the foregoing, and considering the parties' written arguments, I find that Petitioner suffered a moderate to serious GBS injury. He experienced significant medical care, including two rounds of IVIG and over five months of overall treatment through inpatient hospitalization and inpatient rehabilitation facilities, as well as outpatient OT sessions. The injury has greatly impacted Petitioner's everyday life, as he requires assistance for walking, self-care, and other activities, and he continues to experience ongoing fatigue and muscle weakness.

Petitioner requests $195,000.00 for past and future pain and suffering (collectively). Besides the medical record evidence of his course, he references several comparable cases, in which the petitioners received pain and suffering awards in the range of $180,000 to $200,000.00. [7] Mot. at 3; *Hood v. Sec'y of Health & Hum. Servs.*, No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021); *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Devlin v. Sec'y of Health & Hum. Servs.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). The *Hood* petitioner (who received $200,000.00) spent 16 days inpatient, received two courses of IVIG treatment, had five months of outpatient rehab, and had ongoing sequelae, including fatigue and reduced stamina, that interfered with his employment and parenting. *Id.* at 2–4. Petitioner argues that the severity of his pain and recovery period is most analogous to *Hood*, but maintains he had a lengthier hospital stay and underwent more treatment than the petitioners in *McCray* and *Delvin*. Mot. at 22; Reply at 7–8.

In contrast, Respondent proposes a lesser award of $137,500.00. Opp. at 8. Respondent does not offer a counter-comparable case (in contrast to Petitioner's better-documented showing), but argues that Petitioner's clinical course demonstrates a less severe course of GBS compared to other cases. Opp. at 6, 8. He also references Petitioner's prior medical history as a more likely explanation for Petitioner's injuries, as many of the symptoms he experienced prior to vaccination mimicked those experienced post-vaccination. *Id* at 6, 8 (Petitioner had past symptoms of bilateral leg weakness with difficulty walking, hand numbness, decreased strength, and vision loss) *Id.* Moreover, Respondent argues that Petitioner's symptoms reflect what *any* aging individual might experience—noting that the injured parties in the cases cited by Petitioner were not only all generally healthy and/or had no prior relevant medical history, but were approximately ten to thirty years younger than Petitioner. *Id.*

Respondent also briefly focuses on the post-vaccination diagnosis of CLL found in Petitioner's medical history as an explanatory factor for Petitioner's most recent symptoms. Opp.

---

[7] Petitioner also cited *Francesco v. Sec'y of Health & Hum. Servs.*, No. 18-1622V, 2020 WL 6705564 (Fed. Cl. Spec. Mstr. Oct. 15, 2020) and *W.B. v. Sec'y of Health & Hum. Servs.*, No. 18-1634V, 2020 WL 5509686 (Fed. Cl. Spec. Mstr. Aug. 7, 2020)—both of which involved petitioners who were awarded between $155,000.00, and $165,000.00 in pain and suffering.

at 8. Respondent argues that Petitioner had been progressively regaining strength and denied any significant daily impairment until he was diagnosed with CLL approximately sixteen months post-vaccination. *Id.* Respondent also points to an August 2021 Medicare annual visit in which Petitioner described no lack of energy, no difficulties, with activities of daily living, no problems with mobility, and no falls. *Id.* This came three months after Dr. Esquivel had attributed Petitioner's weakness and mobility limitations to GBS in a letter from May 2021 (prepared while the case was pending). *Id.*

As I have explained in prior decisions, the existence of pre-vaccination (or even post-vaccination) comorbidities do not diminish the impact a vaccine injury (GBS in particular) can have on a petitioner's life, and therefore are not per se grounds for a lower pain and suffering award. *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021) (awarding $170,000.00 for actual pain and suffering). But they bear on the extent of suffering independent from the vaccine injury, especially if it can be discerned in the medical record that these comorbidities either required invasive treatments of their own or better explained ongoing symptoms. I nevertheless have taken into consideration the exceptional hardship imposed on Petitioner—who continues to experience some GBS-related sequelae even while battling cancer at the same time.

Here, I find that Petitioner's actual course of GBS was somewhat more intrusive and lengthier than usual, but also that his recovery was reasonably good, featuring the expected limitations from GBS but nothing that could be characterized as a diagnosed permanent disability. I also find that further out temporally, other health issues that appear in the record better explain Petitioner's more recent suffering than his GBS. Thus, he should receive a significant award for pain and suffering, but less than demanded. However, Respondent did not adequately explain or defend his proposed number, so it is appropriate to look within the scope of cases offered by Petitioner rather than move down toward Respondent's lower figure.

Balancing the severity of Petitioner's GBS injury and the impact on him personally against his relatively good recovery, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$180,000.00** in compensation for actual pain and suffering is reasonable and appropriate in this case. This is an above-median and substantial award, and it fairly compensates Petitioner for his suffering, but also distinguishes his more recent experiences, which seem unlikely to be significantly related to his GBS.

### B. Lost Wages – Past and Future

Petitioner requests a total award of $130,311.00 for past and future lost wages (subject to adjustment)[8] relating to his work as a part-time psychologist. Mot. at 30; Reply at 11. To support this component of his damages demand, Petitioner relies on a mix of factual evidence, witness statements, and expert input.

Petitioner relies on calculations performed by his life care planner, Roberta Hurley. *See generally* Vocational Assessment, dated September 2, 2021, filed as Ex. 16 (ECF No. 34-2) ("Hurley Assessment"); Petitioner's Tax Returns (2013-19), filed as Ex. 21 (ECF No. 37-3).[9] Petitioner calculates his past wage loss amounts to be $53,146.00 through the end of December 2021. Mot. at 30. That figure was derived from Ms. Hurley's determination that Petitioner's average annual wage between 2013 and 2018 was $14,804.50. Hurley Assessment at 1. In addition, Petitioner only earned $6,847.00 in 2018, due to work time lost after his vaccine injury in October 2018. Mot. at 29–30. (Petitioner has not shown, however, how these figures add up. In fact, if the annual wage calculated by Ms. Hurley is multiplied by three (for 2019-21), and then the difference between the sum earned in 2018 and expected amount is added, the total is *less* than the amount demanded).[10]

For future lost wages, Petitioner demands $77,165.00, calculating them from January 2022 (when his damages brief was filed) onward. Mot. at 30; Reply at 11; Ex. 20 at ¶ 7. To derive this sum, Ms. Hurley simply relied on Petitioner's assumed 2017 earnings ($15,433.00) (presumably because he could have expected the same amount in years thereafter but for the injury). Mot. at 30. He also has assumed five more years of employment (January 2022 to December 2027), when Petitioner will be 85. Ex. 16 at 1.

In so maintaining, Petitioner offers his own witness statements detailing the impact his injury purportedly had on his ability to function day-to-day in a work environment. *See, e.g.*, Ex 20 at 1–2 (Pet. Supp. Aff.) (describing need for multiple naps throughout the day, extreme fatigue and decreased mental capacity—forgetfulness, absent-mindedness, incoherent thought process); Mot. at 28; Reply at 10. He also maintains that his personal circumstances limit the value of accounting assumptions about an individual's likely work capacity. Reply at 10. Thus, for purposes

---

[8] Petitioner concedes that this figure does not account for taxes and deductions, nor has the future component been reduced to net present value. Mot. at 30. But he asks that those calculations and reductions be made *after* a ruling on the gross figure is determined.

[9] Petitioner also refers to an Exhibit A ("Wage Loss Documents") to support his proposed past earned wages and future wages and notes that it was attached to his motion. *See* Mot. at 30. But this exhibit does not appear on the docket. The only Exhibit A filed in this matter is the Nursing Assessment from Respondent's life care planner, Laura Fox. *See* Ex. A (ECF No. 36-1).

[10] I calculate the correct total, based on Petitioner's reasoning, to be **$52,371.00** (3 x $14,804.50 = $44,413.50) + ($14,804.50 - $6,847 = $7957.50).

of determining future lost earnings, his intent to continue to work into his 80s should override assumptions about what the average worker might reasonably expect.

Respondent has agreed to the propriety of a past lost wage award, but calculates Petitioner's total lost earnings from October 2018 to the end of 2021 to be the lesser sum of $9,475.75. Opp. at 5. Respondent instead begins with a figure based on Petitioner's income/profit *after* expenses, which he derived from Petitioner's tax returns, amounting to $4,285.00 gross, but then (accounting for tax offsets) reduces to the net sum of $2,736.83 annually. *Id.*; Ex. D (Respondent's Estimated Lost Earnings Analysis) at 1. In defense of this lower figure, Respondent also noted that Petitioner had only earned $1,471.56 in 2018 even *before* his receipt of the flu vaccine, with a net loss of $1,265.26. Opp. at 5. Respondent denies the propriety of any future wages award, however. He argues instead that according to a reliable work-life chart, Petitioner could only expect to work for an average of another 3.44 years, or until 2021, when he turned 80—and thus the total lost sum is the most he can reasonably demand. Opp. at 5; Ex. F (Mean Work-Life Expectancy Chart). Petitioner otherwise offered no statistical evidence to justify applying a different rubric to the calculation. Opp. at 6.

The question of actual lost wages is more easily resolved—as Respondent's calculation of the sum is plainly better-defended and explained. *See* Opp. at 6; Ex. 21 at 101, line 29. Petitioner has only offered his tax returns to substantiate his earnings in the relevant timeframe, and Respondent's calculations more credibly and persuasively rely on what they disclose. *See* Ex. D at 1–3. The relevant time period for lost wages is also consistent with the average worker's mean work-life expectancy, given Petitioner's age at the time of vaccination. Opp. at 5; Ex. F (Mean Work-Life Expectancy Chart). That figure is therefore "in accordance with generally recognized actuarial principles and projections." Section 15(a)(3)(A).[11] Therefore, and based on the evidence filed, I shall award Petitioner **$9,745.75** in actual lost wages.

Petitioner's request for future lost earnings, however, cannot be resolved without some more input from the parties. On the one hand, Petitioner's proposal has a speculative aspect to it. I recognize Petitioner's *intent* to continue working into his older years. However, such a desire—however sincere, and even where the work at issue is not physically-intensive— lacks the kind of grounding needed for a future lost wages award. *See Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047, at *11 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying compensation for lost wages/earnings for lack of preponderant support and finding the petitioner's

---

[11] While the Federal Circuit has not interpreted what qualifies as "generally recognized actuarial principles and projections," there are several decisions that interpret "actuarial principles" in a broader sense from other federal and state statutes, where actuarial data and expert opinions are required to substantiate damages. *See, e.g., Chabner v. United of Omaha Life Ins. Co.*, 994 F. Supp. 1185, 1194 (N.D. Cal. 1998), *aff'd*, 225 F.3d 1042 (9th Cir. 2000) (finding that under the Americans with Disabilities Act, sound actuarial principles "must . . . include reference to some sort of actuarial data either in the form of actuarial tables or clinical studies estimating mortality rates"); *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 480 (S.D.N.Y. 2014) (taking into account conflicting expert testimony when assessing "accepted actuarial principles" under a New York statute).

calculations were "rooted in speculation about her incipient earning *goals* or *hopes*—not in 'generally recognized actuarial evidence and projections'" as required by Section 15(a)(3)(A)).

In addition, Petitioner has provided an insufficient analysis of his vocational options in light of his injury (which would serve as set-offs for the amounts he expected to earn). And it has not been demonstrated that Mr. Hurley is even a qualified expert on vocational matters, further reducing the value of the opinion she offered. *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139–40 (2020) (holding that "a one-page letter from a Vocational Specialist is not sufficient to satisfy the Vaccine Act's mandate for application of 'generally recognized actuarial principles and projections' in awarding lost earnings").

At the same time, however, Petitioner's capacity to continue to work, and intent to do so, should not be disregarded (absent evidence that actuarial principles require that this occur). And this issue has otherwise not been adequately addressed by either side. Accordingly, I will defer ruling on it pending more development of the issue by the parties (as explained below).

C.      **Medical Care Expenses – Past and Future**

From the parties' submissions, it is unclear if in fact any *past* unreimbursed expenses have been discussed, demanded, or are called for under the facts. But there are a number of future care items, although Respondent seems to concur that *some* future care is appropriate.

Petitioner (relying on a life care plan prepared by Ms. Hurley), identifies categories of care that are accepted versus those that are not. Mot. at 31–32, Ex. 19 at 3–5. Respondent, by contrast, proposes $36,370.48 for life care expenses expected to be incurred during the first year after judgment, plus an annuity for all future items. Opp. at 9. He offers a life care planner of his own, Laura Fox, who has not accepted all categories of care proposed. Ex. 8 at 1–5. Looking at the briefing as a whole, it appears that the parties have agreed on four items in the life care plans: Medline Rollator Walker with Seat ($29.23 annually for life), Adjustable Cane ($5.10 annually for life), Cane Tips ($12.99 annually for life), and Pride Lift Chair (one-time purchase at $812.00).[12] Reply at 11–12; Opp. at 2–3. These reflect care associated with the kind of ambulatory issues reflected in Petitioner's medical records as of the time his GBS was mostly treated, and they are properly awarded.

But this leaves *twelve* remaining items in dispute. These items include a gym and water therapy, home health aide, an electric wheelchair, batteries and service for wheelchair, an electric scooter, batteries and service for electric scooter, an electric power chair and scooter lift and

---

[12] In his Motion, Petitioner stated that the parties had agreed upon six items in the life care plans; however, he amended his position and noted that he agreed with Respondent that the Medicare Part B Premiums should be stricken as it is a routine cost due to Petitioner's age. Additionally, Respondent included a cost for physical therapy that is likely to be covered by Petitioner's insurance, and thus a gym membership was not agreed upon.

carrier, a rolling shower chair, a cleaning service, adjustable beds, lawn service, and home bathroom modifications. Reply at 13–14; Opp. at 3–4.

I will defer ruling on the propriety of the disputed, future care components to allow the parties additional time to discuss these items, and to assist me in determining how best to resolve this dispute. To that end, the parties shall contact chambers immediately for a status conference, at which time I will provide them some preliminary views about the various unagreed categories of damages. (I note at this time, however, that many of the future care items requested seem self-evidently inappropriate, such as a gym or in-home care. Petitioner is advised strongly to reconsider asking for some of these items, since it does not appear to me that his GBS sequelae go much beyond some ambulation-level issues). The propriety of future lost wages, and best manner in which to calculate them, shall also be discussed at this time.

The parties are otherwise reminded that this case began life in the SPU, and has now existed for three years in the Program. Although determining the remaining damages components may require some effort, I will not permit the process to take excessive additional time—and the parties therefore should not expect to be provided months and months of additional time to resolve these matters (especially given how much time they have already been provided).

## CONCLUSION

In light of all of the above, I find Petitioner is entitled to (a) $180,000.00 in actual pain and suffering, and (b) $9,475.75 in actual lost wages. These figures will be incorporated in the final damages decision to be issued in this case (with some adjustments to the past amount likely appropriate).

The parties shall contact Chambers immediately to set a status conference to discuss how all remaining damages components can be resolved.

**IT IS SO ORDERED.**

<u>s/ Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master