# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 20-1262V

| | | |
|---|---|---|
| THOMAS GRANT, | * | Chief Special Master Corcoran |
| Petitioner, | * | Filed: February 9, 2024 |
| v. | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

*David J. Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Zoe Wade*, U.S. Dep't of Justice, Washington, DC, Respondent.

## SUPPLEMENTAL DAMAGES RULING[1]

On September 24, 2020, Thomas Grant filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine he received on October 3, 2018. Petition (ECF No. 1) ("Pet.") at 1. On August 31, 2023, I issued Findings of Fact and Conclusions of Law Regarding Damages, and therein determined that Petitioner was entitled to certain damages components: **$180,000.00** for pain and suffering, and **$9,475.75** for prior lost wages. However, *future* lost wages, plus disputed life care plan items and amounts, were to be determined later, after the parties were given an opportunity to recalibrate their calculations in light of my Ruling. *See* Findings of Fact Ruling, dated Aug. 31, 2023 (ECF No. 49) ("Initial Damages Ruling").

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

Unfortunately, the parties were unable to resolve any of the remaining damages components, and therefore a Damages Hearing was held on December 18, 2023, in Washington, D.C. The parties also offered additional briefing on November 30, 2023. Respondent's Brief on Future Lost Wages, dated Nov. 30, 2023 (ECF No. 55); Petitioner's Brief in Support of Future Lost Wages, dated Nov. 30, 2023 (ECF No. 56).

Now, after consideration of all of the evidence, and for the reasons described below, I find that Petitioner is entitled to the following remaining damages components: **$5,473.66** for an additional two years of lost past wages through 2023, plus **$5,372.71** for future lost wages through 2025 This Decision also awards the costs for certain disputed items in the life care plan, as noted herein, and includes a total summary of all damages to be awarded to the Petitioner.

## I.    Factual Background

I incorporate by reference the facts set forth in the Initial Damages Ruling (ECF No. 49 at 2–5).

## II.    Hearing Testimony

Both sides retained life care planners, who prepared multiple written assessments of the specific care recommended for Petitioner. Hurley Report, dated July 25, 2015, filed as Ex. 15 (ECF No. 34-1); Hurley Assessment, dated Sept. 2, 2021, filed as Ex. 16 (ECF No. 34-2); Hurley Supp. Report, dated Mar. 7, 2022, filed as Ex. 19 (ECF No. 37-1); Hurley Second Supp. Report, dated Dec. 5, 2023, filed as Ex. 25 (ECF No. 57-2); Fox Report, dated, Nov. 2021, filed as Ex. A (ECF No. 36-1); Fox Cost Projection Rev., dated Nov. 8, 2021, filed as Ex. B (ECF No. 36-2); Fox Supp. Report, dated, Mar. 31, 2022, filed as Ex. E (ECF No. 40-1).

*Petitioner's Expert – Roberta Hurley*

Ms. Hurley received a Bachelor of Science degree in special education, with a concentration in family and juvenile. Tr. at 11. She owns two businesses—one a for-profit where she is a vendor for the State of Connecticut and provides employment and case management support to those with disabilities and for school-to-work transitions, and the other a nonprofit where she provides employment services to those in a wet shelter in New London, Connecticut. *Id.* In addition, Ms. Hurley has worked in the Vaccine Program for thirty years—providing employment plans, needs assessments, and life care plans for individuals of all ages, all types of disabilities, and all types of medical injuries. *Id.*

Ms. Hurley testified that she conducted two "site visits" with the Petitioner—on August 30, 2021 and December 1, 2023. Tr. at 16.[3] During these virtual visits, Ms. Hurley was able to visually assess Petitioner's needs and capabilities. *Id.* In addition, Ms. Hurley relied on two reports offered by one of Petitioner's treating physicians, Dr. Linda Esquivel, who opined that Petitioner's

---

[3] The December 1, 2023, virtual visit also included Petitioner's counsel, Respondent's counsel, Respondent's life care planner, Petitioner, and Petitioner's son.

"increased fatigue along with his impaired balance is related to his Guillain-Barré syndrome." Tr. at 17; Esquivel Narrative Rep., dated May 5, 2021, filed as Ex. 14 (ECF No. 25-1); Esquivel Questionnaire, dated Sept. 14, 2021, filed as Ex. 17 (ECF No. 34-3); Esquivel Supp. Rep., dated Dec. 1, 2023, filed as Ex. 24 (ECF No. 57-1). Ms. Hurley testified that she "saw a marked difference" during the last "virtual" site visit—furthering stating that she "was really worried watching him with a rolling walker" and that Petitioner's legs are not stable. *Id.* at 18. Overall, Ms. Hurley testified that Petitioner requires more specialized care catered to his injuries he sustained post-vaccination. Tr. at 19.

Ms. Hurley briefly discussed Petitioner's comorbidities (i.e., his diabetes and chronic lymphocytic leukemia ("CLL") diagnosis), stating that based upon the medical records, Petitioner's diabetes is well-managed, and his CLL is in remission. Tr. at 32–33. Moreover, Ms. Hurley maintained that she constructed her proposed life care plan based upon the recommendations of Petitioner's PCP, Dr. Esquivel, who attributed Petitioner's symptoms and sequela to his GBS, and not solely on his comorbidities, plus her own virtual site visits. Tr. at 65.

Based on Petitioner's health status, Ms. Hurley made a number of care recommendations, both for personal treatment and assistance as well as physical items or other accommodations which are discussed in greater detail below.

*Respondent's Expert – Laura Fox, R.N.*

Ms. Fox is a registered nurse. She received her bachelor's and master's degrees in nursing. Tr. at 73. She received her life care plan certification in 1998, although she has been involved in life care planning since 1991. *Id.* Ms. Fox owns her own company, Fox Associates, where she provides life care planning services and case management. *Id.* Her clinical experience includes working with individuals with disabilities and she has prepared approximately over 500 life care plans over the course of her career. *Id.* at 73–74.

Ms. Fox participated in two virtual site visits with Petitioner on August 30, 2021, and December 1, 2023, respectively. Tr. at 74–75. Besides these two visits, Ms. Fox noted that she did not have any other contact with Petitioner when constructing her life care plan. *Id.* at 75. Ms. Fox then briefly discussed the questionnaire that Dr. Esquivel received on September 14, 2021, acknowledging that she had prepared *some* of the questions, but there were several that she did not prepare or review. *Id.* at 76; Ex. 17. She explained that oftentimes when there are changes to an individual's circumstances, "life care planners [will] work together to [prepare] a document and then send it to the physician" to help determine the current and future care needs of the individual and to discuss anything that might not be reflected in the medical records. Tr. at 76, 93. Ms. Fox further explained that other than preparing parts of the questionnaire, she did not directly speak with Petitioner's PCP, Dr. Esquivel, regarding Petitioner's condition. *Id.* at 77.

Like Ms. Hurley, Ms. Fox made a number of care recommendations based upon Petitioner's health status and current needs. The remaining disputed life care items are discussed in greater detail below.

3

### III.  PARTIES' REMAINING DAMAGES CONTENTIONS

Based on the categories of care identified by the parties, there are several remaining items in dispute, as discussed below.

#### A.  Home Health Aide

The first item in dispute is the appropriate amount of home health aide Petitioner requires. Relying on Petitioner's medical records and the multiple site visits, Ms. Hurley testified that Petitioner's needs have increased since drafting her life care plan and following the death of Petitioner's wife. Tr. at 18–19. Ms. Hurley noted that Petitioner is currently living alone, with his two sons living nearby to help when they can; however, because his needs have increased "he is not safe in the home without care." *Id.* Thus, Ms. Hurley recommended twenty-eight hours per week through 2025, increasing to forty-two hours per week from 2026 to life end. *Id.* at 20–21; Hurley Rep. at 4; Hurley Supp. Rep. at 2. Ms. Hurley testified that she disagrees with the 20 hour/week recommendation offered by Respondent's life care planner, Ms. Fox, noting that Petitioner's GBS is "really impeding his balance, his strength, [and] his stamina." Tr. at 21. Overall, Ms. Hurley opined that the hours she recommended are not only medically necessary but are "required for him [] to help him with his activities of daily living, [and] being able to live each day [by] not putting himself in jeopardy [or] in danger of injury." *Id.* at 21–22.

Respondent's life care planner, Ms. Fox, recommended twenty hours per week for home health aide to help Petitioner with his overall needs related to his GBS—which includes some ambulatory care, such as bathing and showering, help with general lifting, etc. Tr. at 82. Ms. Fox did not recommend that the number of hours increase overtime because Petitioner's GBS has been stable according to the most recently filed medical records. *Id.* at 82; Ex. 23. Instead, Ms. Fox briefly emphasized Petitioner's comorbidities—stating that, among other things, he suffered from Type 2 diabetes, he had diabetic neuropathy, ulcerations, and cellulitis, as well as low platelets and anemia. *Id.* at 82–83.

#### B.  Gym and Water Therapy

Petitioner requests a fitness center membership, which includes a one-time enrollment fee of $500.00 plus an annual fee of $3,540.00. Hurley Rep. at 3. The requested fitness center is in Petitioner's neighborhood and provides strength training, water therapy, and other rehabilitation programs. Tr. 22; Hurley Rep. at 5; Hurley Supp. Rep. at 2; Hurley Second Supp. Rep. at 1. In addition, Ms. Hurley testified that this particular fitness center also provides a social aspect for Petitioner—noting that "[h]e doesn't have anything social at all except for his kids coming over. . . ." Tr. at 23. She further testified that an alternative gym, such as a Planet Fitness or LA Fitness, would not be a viable option for Petitioner because they do not offer warm water therapy and they are not nearby or easily accessible. *Id.* Ms. Hurley clarified that Petitioner would be joining only

the fitness center, *not* the accompanying country club, and that the fitness center would be an entirely separate cost. *Id.* at 24.[4]

Respondent disagrees with Petitioner's choice of particular fitness center (the one located within Petitioner's neighborhood). Ms. Fox stated that "[i]f Mr. Grant needs therapy . . . he can obtain therapy, as we discussed, through a recommendation from his physician at no cost. Therapy can include warm water therapy if that is what [is] medically necessary." Tr. at 81. She further stated that the particular fitness center recommended by Petitioner is a country club, and that the only way one can become a member and utilize its amenities (i.e., the pool) is to become a member of the country club. *Id.* Moreover, Ms. Fox noted that she confirmed with two individuals associated with the fitness center that the pool is an outdoor pool and only open from Memorial Day to Labor Day. *Id.* Because Petitioner has the ability to benefit from therapy, including warm water therapy, through the recommendation of his physician, Ms. Fox maintains her position that this fitness center membership is not medically necessary.

### C. Electric Wheelchair, Scooter & Powerchair

Petitioner requests an electric wheelchair, scooter, and powerchair. Ms. Hurley stated that Petitioner currently uses a wheeled walker with a seat, but that this was not a safe assistive device for Petitioner—further stating that Petitioner does not have any balance and if his legs were to give out, he would fall and hit his face on the seat or elsewhere. Tr. at 25. Instead, Ms. Hurley recommended an electric power scooter to get around the house more easily, and an electric wheelchair for getting to doctor's appointments and commuting longer distances. *Id.* She further testified that the electric wheelchair she recommended would be covered by Petitioner's insurance, whereas the electric power scooter would not. *Id.* at 25–26. Based on her last virtual visit with Petitioner and on the recommendations of Petitioner's PCP, Dr. Esquivel, Ms. Hurley opined that both an electric wheelchair and an electric power scooter are medically necessary given Petitioner's current status. *Id.* at 26.

Respondent disagrees with this recommendation. Ms. Fox stated that under Petitioner's insurance plan, one mobility device will be covered, as "that is the standard for Medicare and any Medicare supplemental insurance such as TriCare"—including associated maintenance. Tr. at 84. She further testified that Petitioner currently only uses a cane and a wheeled walker, but that if he determined that he would like to get either an electric wheelchair or electric scooter, he would simply need to get a prescription from his physician, and then it would be covered by his insurance. *Id.* at 85. Ms. Fox stated that, based upon her review of the medical records, there was no indication that Petitioner communicated with Dr. Esquivel requesting a mobility device or that Dr. Esquivel specifically recommended the use of such a device. *Id.* at 85–86.

---

[4] As additional support, Petitioner filed an email from the sales director at the fitness center in question which provides a price breakdown for the social/fitness membership fees and associated monthly dues. *See* Ex. 26 (ECF No. 58-1).

### D.  Rolling Shower Chair

Petitioner requests $715.99 (now, and thereafter every ten years for the remainder of his life) for a rolling shower chair. Tr. at 26–27; Hurley Rep. at 7; Hurley Supp. Rep. at 4; Hurley Second Supp. Rep. at 2. Ms. Hurley testified that Petitioner has difficulty lifting his legs to get in the shower, and that a rolling shower chair would not only allow home health aide to assist Petitioner but provide seating in the shower. Tr. at 27. Ms. Hurley further opined that a rolling shower chair is medically necessary for Petitioner due to his GBS. *Id.*

Respondent denies the need for a rolling shower chair. Tr. at 90; Fox Supp. Nursing Assessment at 4. In her supplemental report, Ms. Fox noted that Petitioner is requesting home bathroom modifications that include a walk-in shower with grab bars and a built-in seating. *Id.* Therefore, she was unsure why Petitioner would also need a rolling shower chair. *Id.*

### E.  Cleaning and Lawn Services

Petitioner requests $7,200.00 (now, and thereafter every ten years for the remainder of his life) for weekly cleaning services, plus $3,832.00 for the same time interval for monthly lawn maintenance. Tr. at 27; Hurley Rep. at 8; Hurley Supp. Rep. at 4–5; Hurley Second Supp. Rep. at 2. Ms. Hurley testified that Petitioner is no longer able to do either activity himself—stating that currently if the house is to be cleaned or the lawn maintained, it would have to be done by a family member. Tr. at 27–28. She stated in her supplemental report that Petitioner "used to assist [his wife] with weekly cleaning and now is unable to" as he lives alone. Hurley Supp. Rep. at 4. Ms. Hurley also noted that "lawn maintenance is not a typical expense for homeowners that take care of their own property" and that Petitioner "should not be required to assume this expense that he never incurred prior to his GBS." *Id.* at 5. Ms. Hurley maintains that but for Petitioner's GBS, Petitioner would be cleaning his house and maintaining the exterior of his house himself. Tr. at 28–29.

Regarding lawn care services, Ms. Fox noted in her supplemental report that Ms. Hurley requested additional home health aide for Petitioner, stating that as he gets older, he will require more hours. However, Ms. Fox maintains that if Petitioner is claiming normal problems associated with aging, which is typical for senior citizens, then it is inherently unrealistic to assume he would continue providing lawn care and maintenance services himself even if not vaccine-injured. Fox Supp. Nursing Assessment at 4–5. At the same time, however, Ms. Fox noted that even if lawn care maintenance is a typical homeowner's expense and responsibility, she "would not want to see [Petitioner] doing lawn work with diabetes and chronic foot injuries. Whether he had GBS or not, I would not recommend, as a nurse, someone with diabetes in his condition to do any kind of lawn work." Tr. at 89.

As for cleaning services, Ms. Fox noted in her supplemental report that Petitioner requested weekly cleaning to help with vacuuming, dusting, and changing bed linens, as Petitioner is no longer able to perform these tasks on his own. Fox Supp. Nursing Assessment at 4. However, Ms.

Fox testified that she increased the number of hours for home health aide, who she felt would be capable of some basic cleaning and meal preparation tasks. *Id.*; Tr. at 90. She further testified that "[she] would assume that [Petitioner] would need some help with housekeeping because of his diabetes. He also, again, has anemia, so he gets tired [but that] those do not appear to be related to [his] GBS." Tr. at 90. Moreover, cleaning services would be considered ordinary or routine expenses typically assumed by the homeowner. *Id.*

### F. Adjustable Bed(s)

Petitioner requests $4,970.00 (now, and thereafter every ten years for the remainder of his life) for an adjustable bed and therapeutic mattress. Tr. at 29; Hurley Rep. at 7; Hurley Supp. Rep. at 4; Hurley Second Supp. Rep. at 2. Ms. Hurley testified that a standard hospital bed would be too short for Petitioner, and that he "needs something that can move up in the back, up by the feet, and that can help him when he gets out of bed. . . ." *Id.* She further testified that a hospital bed is inappropriate for Petitioner, and would not allow him to transfer in and out of bed independently and more safely like an adjustable bed would. Tr. at 29–30. Ms. Hurley noted that an adjustable bed is medically necessary and further supported by Petitioner's PCP. *Id.* at 30.

Respondent disagrees with Petitioner's request for hi-low adjustable bed. Tr. at 91; Fox Report at 4; Fox Supp. Nursing Assessment at 4. Ms. Fox stated in her supplemental report that Petitioner's request for such a bed is to help prevent falling and provide proper position for his neuropathic pain. However, "[t]here was no mention of pain during the videoconference call. Fox Supp. Nursing Assessment at 4. But she did agree that Petitioner noted he does not feel his feet beneath him when walking. *Id.* Ms. Fox also testified that should Petitioner require a hospital bed, not only do they come in different sizes to accommodate a patient's individualized needs, but that it would be provided for and paid for by Medicare and TriCare with a prescription from his treating physician. Tr. at 91. Moreover, Ms. Fox contends that "as an aside" there are cheaper alternative hi-lo adjustable beds than what Ms. Hurley recommended, and that the price of the bed proposed in Ms. Hurley's life care plan is somewhat excessive. *Id.*

### G. Home Bathroom Modifications

Petitioner requests a one-time cost of $16,640.00 for home bathroom modifications. Tr. at 31; Hurley Supp. Rep. at 5. Ms. Hurley testified that the home modifications would make Petitioner's current shower more accessible—allowing for a roll-in shower and raised toilet. *Id.* Mr. Hurley testified that the requested materials for the home modifications would likely be more expensive today; however, she further stated that she did not have any issues with the estimates that were provided and incorporated into her life care plan. Tr. at 32.

Respondent's life care planner, Ms. Fox, testified that she was not provided with any photographs of Petitioner's bathroom and thus was somewhat limited in her ability to comment on this particular recommendation. Tr. at 86. However, Ms. Fox noted that she based her recommendation off the estimate that was provided by the contractor. *Id.* She stated that "[i]n most

7

modifications to the home, including bathroom and kitchens, contractors provide an allowance for materials because they do range in cost, and that's one of the biggest variables of cost." *Id*. Here, the allowance provided also includes projected costs for shower tile and a shower faucet replacement. Ms. Fox, however, noted the extensive range of choices in tile and material and offered cheaper, alternative pricing based upon review of the materials offered at Home Depot. *Id*.; Ex. 19 at 6–7; Fox Supp. Nursing Assessment at 5. Thus, Ms. Fox recommended a total allowance of $15,330.00 for Petitioner's home bathroom modifications—stating that her only adjustment with respect to the estimate is that the allotment for materials not be at the highest end. Fox Nursing Assessment at 5. She otherwise agrees that a shower seat and grab bars would be useful for Petitioner given his health status. Tr. at 89–90.

## IV. LEGAL FRAMEWORK

### A. Lost Wages – Past and Future

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner" in accordance with generally recognized principles and projections." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (*citing* Section 15(a)(3)(A)).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "des not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (*citing J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with some evidence, if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g.*, *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2021 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope).

### B. Life Care Items

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that:

(i)  result from the vaccine-related injury for which the [P]etitioner seeks compensation;

8

  (ii)  have been or will be incurred by or on behalf of the person who suffered such injury; and

  (iii)  (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or (II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

  "[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition" *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); *see also I.D.*, 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 2666285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed. Cl. Spec. Mstr. Aug. 14, 2023).

## ANALYSIS

### I. Lost Wages

  In the Initial Damages Ruling, I found that Respondent's calculation of Petitioner's actual lost wages was better-defended and explained, as it more credibly and persuasively relied on what Petitioner's tax returns disclosed. Initial Damages Ruling at 11; *see also* Opp. at 6; Ex. 21 at 101, line 29; Ex. D at 1–3. Based on Respondent's calculation, I awarded Petitioner $9,745.74 in actual lost wages—accounting for October 2018 through the end of 2021 (or up until the point the parties had briefed the issue). However, using the same figure I relied upon in my initial ruling, I am going to allow an *additional two years* of actual lost wages, to include what Petitioner would have earned in 2022 and 2023 (since the hearing on this issue was held in October 2023, and the prior basis for my determination as to the propriety of lost wages did not change as a result of the hearing). Thus, Petitioner is additionally awarded **$5,473.66** in actual lost wages. Tr. at 5; Initial Damages Ruling at 11.

9

As for lost future wages, I indicated to the parties at hearing that I would permit an award, based on my analysis of the issue in light of their briefing of the topic. Tr. at 5–8. In short, Petitioner's briefing persuasively established that some lost wages were appropriate. Even though Petitioner has lived beyond what actuarial principles would predict for a person in calculating lost wages in the future, it is acceptable (and in fact proper) to take into account his actual circumstances—which here are that but for his injury, he would likely have still been able to perform his job tasks (in the more limited, part-time manner that he was engaging in them at the time of vaccination) despite his advanced age. Accordingly, I will award *two additional years* of such lost wages (based on the assumption Petitioner could continue to work in 2024 and 2025). *Id.* at 8.

As noted at hearing, however, in calculating that sum I will rely upon the same annual figure offered by Respondent, and reduce it to its net present value and apply my own calculation based upon what I have done in prior cases. *Gruba v. Sec'y of Health & Hum. Servs.*, No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. Apr. 13, 2021) (adopting the parties' proposed 1.5 percent net discount rate). Here, I will apply a 1.25% offset rate, resulting in an award of **$5,372.71.**

## II.     Life Care Plan Elements

Overall, Respondent's life care planner, Laura Fox, more persuasively evaluated Petitioner's needs and current health status. She also did a better job taking into account Program guidelines for what kinds of costs are allowable. At the same time, Ms. Hurley's testimony confirmed his need for some cost categories exceeding what Respondent was willing to accept. I provide a brief run-down of my findings on the disputed categories below.

### A.     Home Health Aide

Petitioner will be granted 20 hours per week for life for home health aide. Petitioner did not adequately demonstrate why 28 hours per week for the next two years, and then thereafter increased to 42 hours per week until life end, is reasonable and medical necessary, since his most recent medical records indicate that his GBS is stable and his other comorbidities well-maintained.

### B.     Gym and Water Therapy

Petitioner will not be awarded any costs in connection with a fitness center membership. Based upon the evidence filed, it appears Petitioner would seek to utilize the fitness facilities at a nearby county club. But it remains unclear whether Petitioner's fitness center membership would be limited to that, or involve other country club benefits and services independent of the gym. Petitioner simply has not adequately substantiated the propriety of this cost as a damages component, and he has not otherwise offered a figure or evidence that would permit an award of a more basic gym membership at some other facility. Thus, because it is at all times a *petitioner's* burden to substantiate the reasonableness of any damages component he requests, and because Petitioner has been provided ample time to defend this sum, it is denied.

C. <u>Electric Wheelchair, Scooter, & Powerchair</u>

Petitioner currently uses a cane and a rolling walker to ambulate. Although it has been established that Petitioner's future care needs might include a single assistive device such as a wheelchair or scooter, it has not been shown that Petitioner's existing insurance would not cover the item. I therefore do not make specific provision for this, or find that more than one device is necessary.

D. <u>Rolling Shower Chair</u>

Petitioner has not shown that it is necessary for him to have a rolling shower chair, since the bid offered by the contractor for bathroom modifications includes a walk-in shower.

E. <u>Cleaning and Lawn Services</u>

Petitioner will not be granted costs for homes cleaning services. This is a typical homeowner expense, and Petitioner has not adequately demonstrated that he can no longer do any typical tasks associated with cleaning except that it may take longer to complete, or that the circumstances of his vaccine injury justify a special allowance for this sum.

Petitioner will, however, be granted costs associated with *lawn services*. Respondent testified that she would not recommend any one in Petitioner's condition to partake in tasks associated with maintaining and servicing lawns, and this is a different category of service that more directly implicates the limitations placed on Petitioner by his injury. Therefore, Petitioner is awarded $3,832.08 for this service, on a one-time basis as well as the schedule projected by the life care plan.

F. <u>Adjustable Bed</u>

Petitioner will not be granted costs for a hi-low adjustable bed. Respondent made a compelling argument that a hospital bed, if deemed medically necessary, would be provided by Petitioner's insurance provider.

G. <u>Home Bathroom Modifications</u>

Respondent agrees home bathroom modifications are "reasonably necessary," but argues that the allowance should not be at the highest range for materials. Respondent convincingly established that a slightly reduced allowance is appropriate, by demonstrating the availability for alternative material options based on what a comparable store, such as Home Depot, would provide. Therefore, Petitioner will be granted an allowance of a one-time payment of $15,330.00 for home bathroom modifications. Fox Supp. Rep. at 5.

## CONCLUSION

Based on the foregoing, and in the exercise of the discretion afforded to me in determining the propriety of a damages award, Petitioner is determined to be entitled to the following sums:

11

(1) **$5,473.66** in lost actual wages (in addition to the sum already awarded in the Initial Damaged Ruling);

(2) **$5,473.66** in future lost wages, discounted to **$5,372.71**;

(3) An immediate payment of **$19,162.08** (to reflect the one-time payments of **$3,832.08** for Lawn Maintenance, plus **$15,330.00** for Home Bathroom Modifications).

On or before Friday, March 29, 2024, the parties shall file a proffer or stipulation to include the amounts set forth in the prior Initial Damages Ruling, the sums above, plus an amount sufficient to purchase the annuity contract for future care needs (which will include the future lawn service costs

**IT IS SO ORDERED.**

<u>/s/ Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master